PERRY V. LITTLE ROCK & FORT SMITH RAILWAY COMPANY.

1. COMPROMISE: *Rescission of: Recognition of claim.*

The rescission of a compromise of a claim by mutual consent of the parties restores them to the positions they occupied before the compromise was made; and the claimant cannot urge the compromise as a recognition of the claim by the other party.

2. RES JUDICATA: *Decision of Supreme Court.*

The decision of the Supreme Court in a case is the law applicable to all further proceedings in the same case.

3. CORPORATIONS: *Liability for services before organization.*

To make a corporation liable for services performed under contract with its promoter before it was organized, the services must be intended at the time to inure to the benefit of the future corporation, must be rendered in its behalf, and with the expectation and confidence that the company will be bound, and not the credit of individuals.

APPEAL from *Pope* Circuit Court in Chancery.

Hon. G. S. CUNNINGHAM, Circuit Judge.

*U. M. & G. B. Rose* for appellant.

1. The new company was bound by the contract entered into by Everett, as the representative of its promoters; and,

2. The new company has ratified and adopted Everett's contracts, thus making them its own. *Redfield on Railways, p. 16, sec. 5; 1 Mylne & C., 650; 7 Eng. L. & E., 124; 1 Simons, N. S., 586; 9 Simons, 264; 3 Mylne & C., 773; 9 Hare, 129; Field on Corp., sec. 221; 45 N. H., 375; 1 Redf. Am. R. R. Cases, 1; 49 Pa. St., 277; 40 Md., 395; 101 U. S., 392; 37 Ark., 164.*

This was a contract with the promoters of the new company. It inured to its benefit when it organized, and the new company took the benefit of it. The corporators of

the new company were the bondholders of the old, whose agent Everett was. See *1 Pick., 372.*

Where one officer is allowed to control the corporate affairs (as was the president, Redfield, in this case) his action will be binding upon the corporation, without proof of special authority. (*34 N. H., 378; 3 Const., 156; 98 Mass., 59.*) So a corporation will be bound by the acts of an unauthorized agent, if it accepts the advantages. (*Field on Corp., sec. 194; 15 Barb., 323; 5 Hill, 137; 7 Greenl., 96; 37 Conn., 534; 15 Eng. L. & E., 598–9.*

*J. M. Moore* for appellee.

Before the new company can be held under the rulings and law as laid down in *37 Ark., 164; 1 Redf. on R., 15; 79 Penn. St., 54; 65 Ill., 328; 7 Eng. L. & E., 130,* it must be shown that the organization of the corporation was contemplated at the time the alleged contract was made ; that the parties were acting in view of future organization, and the credit extended to the promoters of the enterprise as such, and with the expectation and understanding on the part of both parties to the contract, that the company would pay for the supplies and advances alleged to have been made, and the company must be shown to have accepted the benefits of the contract.

Reviews the evidence and contends that *none of these requisites* are shown.

The statements made by Everett as to the intention of the bondholders, and his authority to bind them, are not competent to prove either proposition. *Wharton on Agency, sec. 44; 31 Ark., 212; 29 Ib., 512.*

As to the ratification by the president, it was merely a proposition to compromise a debt of the old company. And the appellant rejected or rescinded the compromise, leaving the parties precisely as they wc e before. *9 Ired.*

(*N. C. L.*), *380; 4 Dev. & Bat. L, 208; 30 Me., 458; 3 Otto, 548.*

But it was not binding on appellee. As an original un-dertaking of the president to pay the debt of another, it was unauthorized and void. *34 Vt., 144; Morawitz on Corp., 234.*

EAKIN, J. This appeal is from a decree upon further proceedings in the case, after its remand upon the opinion delivered here in a former appeal by defendants; see *Little Rock & Fort Smith R. R. Co. v. Perry, 37 Ark., 164,* for a more definite statement. The opinion then delivered becomes the law of the case, with reference to subsequent proceedings. These were all in equity, the plaintiff hav-ing been allowed to file an amended complaint on the equity side. It charges: That the defendant was the successor of the Little Rock & Fort Smith Rail*road* Com-pany, which had begun and completed a part of the road from Argenta to Fort Smith. The original grant of lands to aid in the construction of this road, made by Congress on the ninth of February, 1873, is set forth, together with the act reviving and extending the grant, passed on the twenty-sixth of July, 1866, and the amendment to the same, passed April 10, 1869, by which the time for building the first section of twenty miles was extended to the nineteenth day of May, 1870. It shows, further, that the old company began the construction of the road late in 1869, and to raise the means, prepared two classes of first mortgage, 7 per cent. coupon bonds, aggregating the sum of $8,500,000. Of these $3,500,000 were secured by a first mortgage upon the railroad and its equipments, ap-purtenances, privileges, franchises, and all property then owned or afterwards to be acquired, save lands granted

by Congress. The remaining $5,000,000 of bonds were in like manner secured by a first mortgage upon all the lands granted by Congress, and all other lands owned or to be acquired. From the time it so began work, until some time in April of the year 1871, when it became insolvent, the company had issued of these bonds, including both classes, an aggregate amount of about $6,000,000, or more, which had been put upon the market, and, as is alleged, bought up for a trifle by George O. Shattuck, F. M. Weld and others, their associates. The company failed to pay any of the coupons or interest warrants. In 1874 suits were instituted to foreclose these mortgages in the Circuit Court of the United States for the Eastern District of Arkansas, and on the tenth of December of that year, all the property, franchises, lands, etc., embraced in the mortgages were sold under a decree which had been rendered on the sixth of November.

The ostensible purchasers were Shattuck, Weld and George Ripley; but it is alleged that they bought for Shattuck, Weld and their associate bondholders, as shown by the report to the court made by Shattuck, Weld and Ripley, explaining the nature and character of their purchase, and by the schedule to said report, containing the names of the bondholders, with the amounts held by each. The property was of the value of several millions of dollars, and was bought in for about a hundred thousand.

It is further alleged that afterwards, on the nineteenth of December, 1874, under the provision of an act of the State, passed ninth day of December, 1874, the said bondholders, as the successors of "The Little Rock and Fort Smith Railroad Company," organized the defendant company under the name of "The Little Rock and Fort Smith Railway Company."

Going back in time, the bill asserts that the old com-

pany, in April, 1871, had completed two sections and a half, or about fifty miles of their road from Argenta, and had graded and done labor on other parts of the road to the value of more than a million of dollars. About that time the road became deeply involved in debt, and was much embarrassed, having procured the greater part of the work to be done on a credit. It was particularly indebted to Pierce, Stacy and Yorston, a firm of building contractors. This firm, on the twentieth of April, 1871, attached the road with all its equipments and property, in the Pulaski Circuit Court, and it never after that resumed operations. The said contractors were placed and remained in possession of all that part of the road which had been finished and equipped, operating and receiving the revenue and income, until near the end of the year 1871, when the Treasurer of the State was appointed receiver under an act to provide for paying interest on bonds which had been issued by the State in aid of railroads. He remained in possession, taking the revenue and income, until the first of November, 1873, when, by some means unaccountable by complainant, the bondholders got into possession and have been in ever since, exclusively, taking the revenues and profits.

Meanwhile, however, whilst the State had possession, complainant says, it became apparent that ten additional miles must be finished before the tenth of May, 1872, in order to save the land grant, under the conditions imposed by Congress. The bondholders advanced the money and completed the required section, ending at Perry's Station. After that it was still necessary to complete twenty additional miles each year until the road should be finished. But he says that the old company never had possession or control of the road from April 1871 up to the time when it was sold out, and the new company or-

ganized on the nineteenth of December, 1874; but that the corporators of the new company, to wit, the bond-holders by their trustees, had the possession from the time they obtained it from the State until the organization of the new company, which has had it ever since.

It is alleged that the corporators of the new, and defendant company, are in effect the bondholders of the old company, and composed all of the corporators of the old company who were capitalists; that they controlled the fortunes of the old company, and desired that it should fail and be sold out, and that a new company should be organized, in order to get rid of about a million and a half dollars of debt for labor and materials. In effect that the new company is in fact the old company "*transmogrified*" to elude its debts. Complainant states that in the latter part of 1872 said bondholders, to save the security of the lands, held a conference in Boston to devise a scheme for the purpose. There it was agreed amongst them by joint operation, to complete the whole line, foreclose the mortgage, purchase the property and franchises, and organize a new corporation, as a successor of the old. With a view to that they entered upon the construction of the road. They appointed one of their number, George Everrett, to represent all, and clothed him with powers to let all contracts for building and supplies and materials, and do all things expedient for the speedy construction of the road. He let to the firm of Beaumont, Curry and Oliver a contract for laying ties and rails to Clarksville, from Perry Station, a distance of forty miles. All materials and supplies were to be furnished by the bondholders. Everett bought of complainant, for the purpose, 11,315 railroad ties, about the first of January, 1873. They were sold to him for the bondholders at thirty cents apiece, amounting to $3,394.50, and were used in laying the track.

Upon this account Everett afterwards paid $270, leaving still due $3,124.50. Also, complainant says, that in June, 1873, at the request of Everett, he erected a depot building on the company's right of way at Russellville, for which he was to receive $1,600. The defendant company afterwards in 1875, paid him for this $1,500, which he accepted in full. Further, he claims that from time to time, between the first of January and the first of May, 1873, at the request of Everett and upon assurances from him that the *bondholders* would pay for the same, he paid construction hands, advanced money and supplies, and furnished wood, fuel and material for the construction of the road to the extent of $4,829.27. He alleges, specifically, that all these things "were furnished to the aforesaid bondholders of the old company, and who afterwards organized and became corporators of the defendant, and credit therefor was specially to them given, upon the representations to him then and there made by the said Everett, that he was the agent of the said bondholders, and that they had taken charge of said railroad for the purpose of constructing and completing the construction of the same, *with the view* of organizing a new corporation as successor to the old;" which matter, he adds, was of general notoriety and understanding. He says further, that he stated to Everett, at the time the latter applied to him for material, money, etc., "that he would not trust the old company for a dollar, that they then owed him a balance of $6,000 and the rise," for work, material and supplies during the years 1870 and 1871. The work on the railroad steadily progressed from the time it was taken possession of by Everett, up to the time of the new organization, and afterwards to its full completion, without intermission. He claims thereby to have been, himself, a promoter of the designs of the new corporation, and to have

thus contributed to its full establishment as successor of the old, with all its franchises and rights of property unimpaired, and charges that the new company, after its organization, accepted the results and enjoyed the benefits of his labor, materials, etc.   Wherefore, he says that the new company in equity and conscience should pay him the balance due on his cross-ties, with interest, and also his account of $4,829.27 for labor, materials, money, etc.

Continuing, he says that after the organization of the new company, its president, Joseph H. Converse, was duly authorized to adjust and settle outstanding claims and equities existing against defendant company then, and at the time of its organization, and his acts in that regard were afterwards ratified and confirmed by the company, and that it held him out to the world as so empowered. That, on the twenty-sixth day of October, 1875, said Converse, upon presentation of complainant's demands, recognized their justice and validity, and paid him $1,500 for the depot building.   As to the other claim he agreed to pay, and complainant to accept, fifty cents on the dollar in stock of the new company at par value.   He says, however, that he was induced to do so by the false representations of Converse to the effect that the stock was really worth par, and that other creditors, holding similar claims, had taken stock in payment.   Finding the representations as to the stock untrue, he alleges that he declined to draw it from the treasurer.   He then sought Converse and induced him to cancel that part of the agreement which regarded the stock.   To obtain this concession he says he paid to Converse one hundred and fifty dollars, or in other words conveyed the depot buildings for $1,350.   He submits that this transaction was an acknowledgment and valid ratification of his claim by the defendant.

The prayer of the bill is that his claim be adjusted and

declared valid against defendant, and that he have a decree therefor and general relief.

The answer of the defendant railroad, upon the points deemed material in this controvery, is substantially as follows:

It denies that it is the successor of the old company in any other sense than this, that it is purchaser for a full and valuable consideration, of the property, rights and interests of that company, as they stood on the nineteenth day of December, 1874, said effects being the road completed from Argenta to Clarksville, a distance of about one hundred miles, together with the road-bed, side tracks, station houses, rolling stock and other property appertaining thereto, and the right to complete and own the road to Fort Smith.

It admits that the old company built three sections (of twenty miles each) of the road, and avers that it built five, a distance of one hundred miles—the three sections, from Argenta to Perry's Station, having been built with means procured by the sale of bonds. The work was done by the contractors, Pierce, Stacy and Yorston.

It denies positively that the old company ever built any part of the road, except through Pierce, Stacy and Yorston, to whom it had let the contract, and who were to furnish all the material, ready for laying down the iron; or that it ever purchased anything of value from complainant, for the purposes of the road.

It admits that the contracting firm did attach the road in the hands of the old company, for a balance claimed, and that it was for a while in the hands of the sheriff, who controlled its running operations, and that in the summer of 1872 it passed into the hands of a receiver for the State.

It states that, in view of the possible loss of the land grant, and to save it, a few of the Boston bondholders

subscribed and advanced to the old company $50,000, to be applied to the two additional sections to Clarksville. This was done upon an agreemont between those subscribing and the board of directors of the old company, that Everett, as the agent of both parties, should direct the disbursement of the money in the work. Everett, with the sanction of the old board, let the contract to Curry & Beaumont, to complete the two sections to Clarksville. By the terms of that contract Everett and the directors were to furnish iron rails and ties, and nothing else. In this work defendant concedes that plaintiff did sell to Everett about 6,500 ties, but nothing else in his accounts. If the other things were furnished at all it was to Pierce, Stacy & Yorston, in their work east of Perry's Station. With regard to the depot house, that was built by complainant largely for his own purposes, but was used as a station. Inasmuch as it was built upon the grounds of the old company, with its permission, his property in it was recognized, and has been equitably adjusted.

It is positively denied that the bondholders ever took possession of the railroad, or any part of it, or of its revenues and income.

Further, it alleges "that the said Everett had no authority or power whatever, as agent of the bondholders, or any one else, for any purpose, except to disburse the $50,000 in the work of completing the said two sections; and had no power or authority whatever to act for the bondholders, or to purchase anything upon their credit."

Upon the foreclosure proceedings in 1874, the bondholders bought in the property by their agents, Shattuck, Weld and Ripley, nominally for $100,000, but really for their bonds, amounting in face value to eight and a half millions of dollars, and organized the new company on the

nineteenth day of December, 1874, under an act of the Legislature passed the ninth day of December, 1874.

Again, defendant denies "that the said Everett, in expending the $50,000, acted for the bondholders, or that said bondholders, at the time of the expenditures, had any idea of taking possession of the said road, or ever owning the same," * * * "nor were such expenditures made with any view to the said bondholders taking possession of the said road or organizing into a corporation, or with a view of promoting any such organization."

With regard to the matter with Converse, president of the defendant company, it is denied that complainant ever presented to him any account against the new company, or against the bondholders or against Everett, but one against the old company, or against Pierce, Stacy & Yorston. There were some negotiations about it, by way of compromise, which failed.

Upon these pleadings and depositions taken the cause was heard, and the bill was dismissed for want of equity, the costs, however, being adjudged against defendant. The complainant appeals.

It is evident that the complainant relies, for recovery, chiefly upon two grounds. One being this: That although no contract may have been proven with the defendant nor with persons engaged in the organization of the company, of such nature as to render the company liable after it came into existence, on the grounds of having accepted and enjoyed the benefits of the contract, yet that the company had made itself liable by the recognition of his claim by the president, Converse, and the offer to settle the same in stock. Upon this point the argument seems to be, that although the offer to pay stock was rescinded at the request of complainant, yet that the recognition of the claim remains fully binding, and that it must now be

1. COMPRO-MISE: Rescission of: Recognition of claim.

discharged in money. To say nothing of the failure of any proof of the power of the president of defendant company to bind it by mere verbal promises, there is no clear proof, or even preponderating evidence, that the president so intended. Doubtless the company respected his action in the matter and would, without demur, have acquiesced in any settlement of the account made by him, as it appears to have done in the matter of the purchase of the depot house. But it does not follow that such supposed acquiescence implies right in the president to positively bind the company, much less when a mere compromise was intended, which was never accepted. The matter with regard to the purchase of the building stands unquestioned by either party, and passes out of the case. The rescission of the agreement to give stock for the account for the cross-ties and other matters, simply throws the parties back upon their original rights without prejudice to either. It cannot leave the complainant with a right newly acquired through an agreement he has insisted upon repudiating. This is the settled law with regard to all propositions made by way of compromise. The claim on this ground is not tenable.

The pivotal question on which this case must turn, lies behind this in the equity which one who deals with the projectors of a corporation, with regard to matters which are intended to inure to the benefit of the corporation, when organized and in enjoyment of the benefit, to have the contract carried into effect. This will become a legal right if the corporation should affirm the contract, or do any act from which an affirmance may be implied, but at law the general rule obtains that corporations cannot be bound by acts done or promises made in their behalf before they come into existence. This principle was discussed, and its limitations defined in this case upon the

Perry v. Little Rock & Fort Smith Railway Company.

former appeal as clearly as the authorities afforded light for doing. It originated in equity, and is still subject of equity jurisdiction, although in clear cases of ratification or adoption it may now be enforced at law, especially in those States in which the separate courts of equity have been abolished. This was done in the case of *Bommer v. Am. Spiral, etc., Manf. Co., 81 N. Y., 468.*

A careful review of the doctrine announced upon the former appeal (*see 37 Ark., 164*) has confirmed the court in its conclusions then reached; and, in any case, it must be the law applicable to further proceedings in the same cause.

2. RES JUDICATA: Decision of Supreme Court.

It was there announced that the doctrine cannot apply to cases in which private persons, contracting exclusively upon their individual credit, afterwards create a corporation for the more convenient management and enjoyment of the benefits acquired by the contract. This is obvious from the consideration that the enhanced value of the property so benefited, or the rights so acquired by individuals are estimated and allowed by the corporation subsequently taking it, and shares are issued accordingly. It would be unjust to other stockholders to require the corporate body to pay again for the labor or material which enhanced this value. That obligation should still rest upon the original contractors, upon whose credit the work was done or the material furnished. It may be illustrated by supposing that the proprietors of an eligible site for a manufactory should contract, upon their individual responsibility, for the erection of suitable buildings, the addition of the necessary appurtenances, and the acquisition of water privileges and rights of way, with a view to forming a corporation for manufacturing; and should afterwards form one with others who subscribe for shares and put in their property for shares at its enhanced value.

3. CORPORATIONS: Liability for services before organization.

It would be unjust, in the absence of any claim of lien, to hold the corporate body liable for the improvements. The services performed must be intended at the time to inure to the benefit of the future corporation; must be made or done in its behalf, and with the expectation and confidence that the company will be bound and not the credit of the individuals.

The proof upon the hearing before the Chancellor does not materially alter the somewhat lengthy and full statement of the case made by the reporter in the former report in 37 Ark. It fails to show clearly, in the first place, that Everett had authority to bind the bondholders, or that his agency extended beyond the expenditure of the $50,000 subscribed by some of the bondholders, for the purpose of making the requisite construction, to save the security of the land. It does show that the contracts were made by Everett, at least formally, in behalf of the old company, which was still a corporate being. And although it is shown that Perry refused to rely upon the credit of the old company, and was assured by Everett that the *bondholders* would be responsible, yet it was still to the credit of the bondholders as individuals that he trusted. They were men of wealth, and responsible if Everett had authority to give those assurances. *Non constat* that they might not have been only perfecting their security with a view to realizing their debts. That afforded sufficient motive for their action. There was nothing in that to induce the conclusion that they would afterwards create a new corporation and become stockholders in that. It was not a necessary consequence, in a business view, that they would find it best to do so. There is some proof, in complainant's own testimony alone, that he expected *from Everett's assurances* that the bondholders would continue to manage and control the road under a new organization, but the proof

utterly fails to show that Everett had any authority to make such representations, and the preponderance of evidence is strong to show that the bondholders, then, had no intention of buying in the property and making a new corporation, and never matured the plan until more than a year afterwards.  To this effect is the testimony of Converse, one of the bondholders, and the president of the defendant company.  His evidence is unimpeached, and his interest in the matter gives assurance of better information upon the subject than could have been had by any other witness.  In other words, the proof fails to show sufficiently that, at the time of the contract, either Everett or the bondholders who had employed him to act in their behalf in conjunction with the old directory, were engaged in promoting the new corporation, afterwards resolved upon and created, or doing anything else than endeavoring to save the securities of the bondholders.  The onus of this proof was on complainant.  When the sale was afterwards made under the foreclosure, any other parties might have bid and would have had to pay the enhanced value of the securities given by the construction of the road; and, in theory at least, the actual purchasers did the same.  If it had been bought by strangers there is no equity upon which Perry might have followed his claim into their hands and made it binding on any corporation they might form.  The bondholders bid, we must presume, in competition with the world, and would have the same right to form a disincumbered corporation, although their individual liability to Perry might remain as it was.  It is a fallacy to contend that any number of individual debtors, becoming a corporation, thereby shift their obligation upon the corporation, even though they may constitute its capital stock, by putting in the property for which the debts were incurred.  Still their individual debts

will remain, and the corporation itself will owe nothing nor be affected, except in case of liens.

We do not think, upon a review of the whole testimony, that this is a case of a contract made with the promoters of a future corporation, upon the credit of the corporation to be formed, and with the intention mutually entertained that the corporation would be bound when organized. It rather appears a case of credit extended to the individual bondholders in person, and their liability will depend upon the authority vested in Everett. With that aspect of the case we have nothing to do.

Affirm the decree.