BRYEANS, ADMX., *v.* CHICAGO MILL & LUMBER CO.

Opinion delivered January 21, 1918.

1. MASTER AND SERVANT—DEATH—ACT OF EMPLOYEE—SCOPE OF EMPLOYMENT.—Plaintiff's husband was shot and killed by the foreman of defendant's box factory, and plaintiff brought an action for damages against the defendant therefor. *Held,* under the testimony it was a question for the jury whether, in committing the act, the foreman was acting within the scope of his employment.

2. MASTER AND SERVANT—KILLING—LIABILITY FOR ACT OF SERVANT.—Defendant's servant was charged with the duty of keeping third persons from talking to other of defendant's employees. The said servant reprimanded deceased for talking with such employees, and after a quarrel the servant shot and killed deceased. Deceased's widow brought an action against defendant company for damages. *Held,* defendant's servant would be held to have acted within the scope of his employment if the killing grew out of a quarrel which arose when the servant told deceased to quit bothering the men, and the quarrel was continuous to the time of the killing; but it would be otherwise if the quarrel thus started had ceased for an appreciable interval.

Appeal from Crittenden Circuit Court; *R. H. Dudley,* Judge; reversed.

*J. T. Coston,* for appellant.

It was error to direct a verdict for appellee. The master was clearly liable as Breysacre was acting within the scope of his authority. The case should have been submitted to a jury. 42 Ark. 553; 58 *Id.* 386; 131 S. W. 971; 88 *Id.* 582; 6 Labatt, Master & S., § 2348; 93 S. W.

600; 52 *Id.* 834; 18 So. 923; 122 N. W. 486; 58 S. E. 609. The whole transaction was one and the same.

*Coleman, Lewis & Cunningham,* for appellee.

The court properly directed a verdict. The killing was not done within the scope of Breysacre's authority nor in furtherance of the master's business. It was a personal quarrel and encounter and Breysacher acted in self-defense. Labatt on Master & Servant, § 2288; 93 Ark. 403; 77 *Id.* 608; 115 *Id.* 288; 84 *Id.* 193; 32 Fed. 838; 143 N. C. 176; Labatt, M. & S., § § 2276-2286; 69 Md. 257; 81 Ga. 485; 106 Ark. 115.

### STATEMENT OF FACTS.

Appellant sued the appellee for damages alleged to have accrued to her by reason of the killing of her husband by one J. A. Breysacre, who, at the time of the killing, was in the employ of the appellee as superintendent of its box factory. The appellant alleged in her complaint that one of the rules of the company forbade "wood haulers and others to converse with, disturb or in any manner interfere with the laborers" employed by the appellee, and likewise forbade the laborers to converse with wood haulers or others who were not in the employ of the appellee; that it was the duty of the superintendent Breysacre to enforce this rule, and that while acting within the scope of his employment for the purpose of enforcing this rule he killed John Bryeans, the husband of the appellant.

Appellee denied that it had such a rule, and denied that Breysacre was acting within the scope of his employment when he killed Bryeans, and alleged that Breysacre killed Bryeans in a purely personal encounter, for which appellee was in no manner responsible.

Giving the testimony its strongest probative value in favor of the appellant, the facts are substantially as follows:

Lange had general supervision and control over all the employees. Shatz was next in authority, and Brey-

sacre was next in authority to Shatz, and was the foreman and superintendent of appellee's box factory.

There was a rule of the company requiring the foreman or superintendent to look after his department and keep people from bothering the men while at work. The assistant superintendent was asked the following question: "Well, was Mr. Breysacre within his line of duty or not in telling Mr. Bryeans he would have to quit bothering the men in the factory—talking to them?" and answered, "Yes, sir."

Bryeans was authorized to haul kindling from appellee's box factory, and he was in front of the kindling platform when the killing took place. He had been authorized to haul, and had been hauling kindling from appellee's plant for several years. He had driven his wagon to the platform and was lifting it in position to dump the kindling into it, when Breysacre said to him, "John, you will have to quit giving orders to that negro up there." The negro, at that time, was on the kindling platform in the act of dumping a load of kindling into the wagon. Bryeans said that "he had not been giving any orders to the negro." Breysacre replied, "Yes, you have; furthermore, you have been bothering the men in the shop. Every time you go by you bother Skinny Morgan, you stop and talk to him." Bryeans said he had not been bothering Skinny Morgan, and Breysacre again affirmed that he had. The two men by this time had become excited. When the dispute between them first started Bryeans had his gloves on and a smile on his face. After it had progressed some little time Bryeans seemed to be angry and the smile went off. He took his gloves off and laid them on the back end of the wagon and stepped away from the wagon. His face was flushed with anger. He ran his hands in his pockets and confronted Breysacre. The argument was then growing more heated all the time and Shatz got in between them. At that time they were close enough together for Shatz to put his hands on each of them and push them back. When Shatz thus separated them he said to Bryeans, "There was not any use in get-

ting into any heated argument about the thing; that whatever Mr. Breysacre had told him he would have to abide by that.'' They stopped talking and Shatz backed away from them, thinking it was all over with. Just a second or so after Shatz stepped away from between them they started to talking again in a low voice, and finally Bryeans told Breysacre, in a loud and heated way, that he would have to see Mr. Lange about it, and they apparently got mad all over again. Breysacre said that Lange did not have anything to do with it. Bryeans then called Breysacre a G—— d—— liar and started towards him and pulled his knife out of his right hand pants' pocket. Breysacre called Bryeans a G—— d—— liar and the next thing was the shot, when Bryeans threw up his hands, placing them on his face over the place where the bullet struck, and turned to Shatz and said, ''He has killed me.'' The whole thing happened quickly, and Bryeans died in a very short time.

There was some conflict in the testimony as to the exact attitude Bryeans was in at the time the pistol was fired, whether he had his hands in his pockets or down by his sides, but this testimony is not material to the issue here.

The court instructed the jury to return a verdict in favor of the appellee, which was done, and from a judgment in favor of the appellee against the appellant for costs and dismissing appellant's cause of action this appeal has been duly prosecuted.

WOOD, J., (after stating the facts).   (1)   Whether or not Breysacre, at the time he killed Bryeans, was acting within the scope of his employment was an issue, under the evidence, for the jury to determine. While the evidence is undisputed, it can not be said that all reasonable minds would draw the same conclusion from it.

Giving the evidence its strongest probative value in favor of the appellant, which we must do in testing the ruling of the court directing a verdict against her, there was evidence to warrant the conclusion that Breysacre

was acting within the line of his duty when he told Bryeans that he would have to quit giving orders to the negro up there, and when he told him that he had been bothering the men in the shop; that this led to a controversy between Breysacre and Bryeans which resulted in the killing. In a word, there was testimony from which the jury might have found that Breysacre killed Bryeans while he was endeavoring to enforce the rule of the appellee requiring him to look after his department and to keep people "from bothering the men, the employees, while they were at work."

The undisputed testimony shows that the act of Breysacre in telling Bryeans that he would have to quit bothering the men in the factory caused a dispute and angry words to pass between them, whereupon the assistant superintendent interposed, separated them and they quieted down in their talk, in fact stopped talking, and Shatz backed away from them, thinking it was all over. But in a second or two they started up the argument again, first talking in a low voice, then becoming more excited, and finally Bryeans told Breysacre that he would have to see Mr. Lange about it. Then Breysacre told Bryeans that Lange did not have anything to do with it, whereupon Bryeans called Breysacre a G—— d—— liar, and he replied in kind; then the shooting took place.

Viewing the evidence in its strongest light in favor of the appellant, the jury would have been warranted in finding from this testimony that the killing was but the climax of the quarrel between Breysacre and Bryeans, which, although interrupted for a second or two, was in fact but one continuous quarrel caused by the act of Breysacre in reprimanding Bryeans, which act was in the line of Breysacre's duty. On the other hand, the jury would also have been warranted in finding from the evidence that, although the quarrel was started by Breysacre while in the line of his duty, yet the quarrel was stopped by the assistant superintendent, and, in a second or two thereafter the quarrel was started or renewed by Bryeans telling Breysacre that he would have to see Mr.

Lange about it, and upon Breysacre's reply that Lange did not have anything to do with it, calling Breysacre a G—— d—— liar.

These different views which reasonable minds might have drawn from the evidence made the issue as to whether or not Breysacre was acting within the line of his duty when he fired the fatal shot one of fact to be determined by the jury, and not one of law to be decided by the court.

(2)   If the quarrel which was started by Breysacre in telling Bryeans that he would have to stop bothering the men in the shop was continuous to the time of the killing, and the killing grew out of such quarrel, then Breysacre at the time of the killing was acting in the scope of his employment. But if the quarrel which was thus started had ceased for an appreciable interval, however short, and was then renewed through the fault of Bryeans and the killing was the result of the quarrel thus renewed by Bryeans, then Breysacre at the time of the killing was not acting within the scope of his authority. See 6 Labatt, Master & Servant, and cases cited. The effect of the instruction of the court was to hold as matter of law that the quarrel was not continuous, and that Bryeans instigated and renewed the quarrel that had ceased.

Moreover, although Shatz testified that Breysacre was acting within the line of his duty when he told Bryeans that he must "stop giving orders to that negro," and stop talking to the men, bothering them while they were at work in the shop, he also testified that Bryeans denied the charge. This made it a question for the jury as to whether Breysacre was endeavoring in good faith to enforce the rule of the appellee, or whether he had turned aside from his duty and the service of the appellee to serve his own individual ends by engaging in a mere personal controversy with Bryeans. If the latter was his purpose, then of course the appellee was not liable. Therefore, as we view the evidence, the issue as to whether Breysacre was acting in the scope of his authority, at the time he killed Bryeans, was, as stated in the

beginning, one of fact to be submitted to the jury under appropriate instructions.

In one of the latest cases upon this subject we said: "No hard and fast rule has been or can be prescribed by which to determine what acts are within the scope of a servant's employment. Each case is governed by its own particular facts, under certain general rules of law. Cooley says: 'Where a servant acts without reference to the service for which he is employed, and not for the purpose of performing the work of the employer, but to effect some independent purpose of his own, the master is not responsible for either the acts or omissions of the servant." Cooley on Torts, 1032; 26 Cyc. 1536. Conversely, when the servant acts with reference to the services for which he is employed and for the purpose of performing the work of his employer, and not for any independent purpose of his own, but purely for the benefit of his master, it is generally held, under such circumstances, that the acts so done are within the scope of the servant's employment.

In the case of *Sweeden* v. *Atkinson Improvement Co.,* 93 Ark. 397, 402, we said: "The act of the servant for which the master is liable must pertain to something that is incident to the employment for which he is hired, and which it is his duty to perform, or be for the benefit of the master. It is therefore necessary to see in each particular case what was the object, purpose and end of the employment and what was the object and purpose of the servant in doing the act complained of."

In *St. L., I. M. & S. Ry. Co.* v. *Grant,* 75 Ark. 579, we said: "It is well established that a principal is liable for all torts, negligence, or other malfeasance committed by his agent in the course of his employment, and for the principal's benefit, although such torts or negligence are not authorized or ratified by the principal, or even though he had forbidden or disapproved of them, and the agent disobeyed or deviated from his instructions in committing them. If, from a consideration of all the facts and cir-

cumstances of the case, it is determined that the agent was acting for his principal, and in pursuance of his real or apparent agency, at the time the tort was committed, then it may be said that he was acting in the course of his employment, and the principal will be liable for such tort, whether authorized or not.''

It is believed that these general principles of law, announced by this court, which are in conformity with the authorities generally, will enable the court to formulate a correct charge in submitting to the jury the issue as to whether Breysacre, at the time of the killing, was acting within the scope of his employment.

The issue as to whether Breysacre was justified or excused in committing the homicide in so far as that issue concerns the appellee is not presented by this appeal.

For the error indicated the judgment is reversed, and the cause is remanded for a new trial.

HART and SMITH, JJ., dissent.