CHICAGO MILL & LUMBER COMPANY v. BRYEANS.

Opinion delivered February 10, 1919.

1. APPEAL AND ERROR—LAW OF CASE—SUBSEQUENT TRIAL.—A declaration of the court on former appeal became the law on the second trial of the case.

2. MASTER AND SERVANT—CAUSING DEATH OF THIRD PERSON—QUESTION FOR JURY.—In an action for death of a third person killed by defendant's employee evidence *held* to justify a finding that decedent was killed by such employee while the latter was engaged in the master's business.

8. APPEAL OF ERROR — LAW OF CASE.—On a second trial of a case where the evidence was not materially different from what it was on the former trial, it was the duty of the trial judge in instructing the jury to frame instructions in keeping with the declarations of law of the court on the former appeal.

4. TRIAL — INSTRUCTIONS — THEORY OF CASE.—In an action for the death of a third person killed in an altercation with an employee of defendant, where plaintiff's theory was that the quarrel arose out of defendant's business and continued until the killing, and defendant's theory was that there was a cessation of the original altercation and that the quarrel was renewed by deceased, the two theories were properly submitted in separate instructions.

5. MASTER AND SERVANT—KILLING OF THIRD PERSON—LIABILITY OF MASTER.—Where a quarrel concerning the master's business between a servant and a third person was begun or renewed by the servant and continued until the killing, then the master would be responsible, even though the decedent resented the actions of the servant and cursed him, unless the killing was done in self defense.

6. DEATH—SELF-DEFENSE.—A killing would not be justified as being in self-defense because the slayer believed decedent was about to make an assult upon him with a knife unless such belief was based on good grounds.

7. MASTER AND SERVANT—SCOPE OF AUTHORITY.—Where a servant killed a third person because the latter called him a liar in a con-

troversy concerning the transaction of business for the master within the servant's authority, the master was liable for damages for the wrongful killing.

8. ASSAULT AND BATTERY—DEFENSES.—Anger and abusive language will in no event justify an assault and battery, but can only go in mitigation of damages.

9. DEATH—PUNITIVE DAMAGES—WRONGFUL KILLING.—Where defendant's employee shot plaintiff's deceased while such employee was acting within the scope of his employment, without any excuse save that decedent called him a liar, punitive damages were properly allowed for the wrongful killing.

10. DEATH—PUNITIVE DAMAGES—AMOUNT.—Where defendant's servant shot decedent at a time when he was standing still six feet from him, with his hands down by his side, punitive damages of $3,000 was not too large by way of punishment, although deceased called the servant a liar.

Appeal from Crittenden Circuit Court; *R. H. Dudley,* Judge; affirmed.

*W. R. Satterfield* and *Chas. T. Coleman,* for appellant.

The evidence here is materially different from that on the first appeal. 132 Ark. 282. In the present case there is no evidence to support the verdict. No liability of defendant is proven because (1) Bryeans started the difficulty. (2) If Breysacher started it, it was about a past offense and Bryeans was not acting within the scope of his authority, or (3) regardless of who started it, and took a "personal turn," the killing was prompted by the resentment of Breysacher and was terminated by the master and afterwards renewed by and through the fault of Bryeans. The court erred in its instructions to the jury and there is no evidence to support the verdict and it was error to allow punitive damages. 32 Fed. 838; 143 N. C. 176; 6 Labatt on Master and Serv., §§ 2286-8; 69 Md. 257; 106 Ark. 115; 115 Ark. 288; 84 *Id.* 193; 69 *Id.* 134; 81 Ga. 485; 106 Ark. 115.

No case for punitive damages was made. 87 Ark. 123. The instructions are conflicting and misleading. 99 Ark. 377; 110 *Id.* 197; Crawford's New Digest, 4990, § 89.

*J. T. Coston,* for appellee.

The verdict of the jury settles all questions of fact. Breysacher was the aggressor in the killing and was acting within the scope of his authority. The facts here are more favorable to plaintiff than on the first appeal and there is no error in the instructions given or refused. 200 S. W. 1005-6; 131 *Id.* 971; 42 Ark. 533; 88 S. W. 582; 6 Labatt M. & S., § 2348; 93 S. W. 600; 52 *Id.* 834; 18 So. 923; 200 S. W. 7005-6; 56 *Id.* 171; 44 Ark. 395; 55 *Id.* 614; 183 *Id.* 186; 64 Ark. 620; 102 S. W. 702; 126 *Id.* 378-9; 190 *Id.* 109; 86 *Id.* 413; 142 U. S. 23; 64 Ark. 613; 86 S. W. 1005; 87 *Id.* 442; 56 Ark. 602; 6 Labatt, § 2349. Punitive damages were properly allowed as the objection was a general one. 145 S. W. 567.

HUMPHREYS, J.   This cause was here on appeal under the style of *Bryeans, Admx.* v *Chicago Mill & Lumber Co.,* and was reversed and remanded for a new trial on January 21, 1918. The case is reported in 132 Ark at page 282. Upon remand the case was submitted to a jury upon the pleadings, evidence adduced and instructions of the court. The jury returned a verdict against appellant for $9,000 compensatory damages, with interest, and $3,000 punitive damages, with interest at the rate of six per cent. per annum from April 4, 1915. A judgment was rendered in accordance with the verdict, except as to interest on the amount of punitive damages. From that judgment an appeal has been prosecuted to this court under proper proceedings. On the first hearing, the trial court acquitted the Chicago Mill & Lumber Company of liability. Upon appeal this court held that the testimony presented questions for determination by a jury and announced the general principles of law applicable to the facts in the case.

It is contended by appellant that the testimony in the record now before the court is materially different from the testimony in the record on the former appeal, and that now, under the undisputed evidence, appellant is not responsible. The suggested differences are that the evidence now shows, and did not show before, that the

quarrel was (1) about a past event; (2) that Breysacher did not start it; (3) that it took a personal turn, and (4) that it came to a close through the intervention of appellant's assistant superintendent, after which Bryeans renewed it.

The first point of difference suggested involves that part of the testimony relative to violations of non-interference rules with Breysacher's men by outsiders. Quoting from the statement of the case on former appeal, the evidence on the particular point involved was as follows:

"Bryeans was authorized to haul kindling from appellee's (Chicago Mill & Lumber Company's) box factory, and he was in front of the kindling platform when the killing took place. He had been authorized to haul, and had been hauling kindling from appellee's plant for several years. He had driven his wagon to the platform and was lifting it in position to dump the kindling into it when Breysacher said to him, 'John, you will have to quit giving orders to that negro up there.' The negro at the time was on the kindling platform in the act of dumping a load of kindling into the wagon. * * * 'Furthermore, you have been bothering the men in the shop. Every time you go by, you bother Skinny Morgan; you stop and talk to him.'"

The evidence in the present record disclosed that Bryeans was a preferred wood hauler and near the box factory loading his wagon, when Breysacher opened the conversation with him. Breysacher testified on direct examination that he complained to Bryeans about talking to his men, and called his special attention to the fact he had been talking to Skinny Morgan; that, on that particular occasion, he had not observed Bryeans talking to one of the employees. On cross-examination touching upon this point, Breysacher answered, in response to questions, as follows:

"Q. What did you first say to Bryeans? A. I don't recall word for word. As well as I can remember, I wanted him to quit bothering my men and told him that.

There was a negro dumping a load of wood, and, if my memory is right, I told him especially that negro."

It is apparent from Breysacher's testimony that he was not complaining to Bryeans on account of a present interference with his men, but that he was calling his attention to past interferences in order to prevent future interferences. We do not think this fact differentiated the testimony in the present record from that given by F. W. Schatz on the first trial. The evidence of both Breysacher and Schatz showed that the negro was standing near by when Breysacher addressed Bryeans, but Schatz did not testify on the first trial that Bryeans was attempting to give the negro any orders on the particular occasion when addressed by Breysacher. Learned counsel has cited authorities under this heading in support of the contention that the quarrel and killing must have grown out of a present, and not a past infraction against the rule which Breysacher, as foreman, had a right to and was attempting to enforce before appellant, the master, would be responsible in damages for the killing. When the case was here on former appeal, this court held to the contrary under the facts of the case, which are not materially different from the facts now before us. The facts were, and are, that Breysacher had authority to prevent an interference by outsiders with his men. Bryeans was hauling wood from a point near the box factory. Breysacher had control of the men working there. A negro employee was unloading kindling near him. Breysacher claimed to have seen Bryeans talking to his men, and, in order to prevent immediate or further interferences, enjoined Bryeans from talking to the men in the shop. Taking into consideration that both the time and place offered an opportunity for Bryeans to again interfere with the men, this court held on former appeal that Breysacher was acting within the scope of his authority when he took Bryeans to task for having talked to the men and in attempting to prevent further interferences. It is unnecessary to discuss the authorities cited by appellant on this point, because the declaration of the court on former ap-

peal became the law on the second trial of this case. *Perry* v. *Little Rock & Ft. Smith Ry. Co.,* 44 Ark. 383; *Ambleton* v. *Dyer,* 53 Ark. 244; *Vogel* v. *Little Rock,* 55 Ark. 609.

On the second point of difference suggested, to the effect that the evidence now shows that Breysacher did not start the quarrel, learned counsel for appellant have not pointed out to us the differences in the evidence they contend for, but content themselves with the argument that the court erred on the former appeal in concluding that Breysacher began the quarrel by calling Bryeans' attention to the fact that he had been interfering with his men by talking to them. We have carefully read the testimony given by Breysacher on this trial and by Schatz on the former trial, with reference to the beginning of the controversy, and it seems clear to us that it was started by Breysacher approaching and saying to Bryeans that he must quit bothering the men in the shop, especially that negro who was near by; and in calling his special attention to the fact that he, Bryeans, had been bothering Skinny Morgan by talking to him. At least, it can not be said from the record before us that the undisputed evidence showed that Bryeans began the difficulty.

The third difference suggested is that the undisputed evidence in the present record showed that the killing resulted on account of Bryeans calling Breysacher a G— d— liar in relation to personal matters, and in assaulting him with a knife; while on the first trial the evidence tended to show that the killing had relation to the company's business. It is true that Breysacher testified on the second trial that he killed Bryeans in necessary self-defense, and that he did not have in mind the company's business at the time he fired the shot. It is also true that he did not give this testimony on the former trial. There is evidence, however, in the record, from which the jury might have concluded that Bryeans made no attack whatever upon Breysacher before or at the time Breysacher fired the fatal shot. Two witnesses testified that at the time the fatal shot was fired, the parties were six feet

apart, and that Bryeans was standing perfectly still with his hands dropped by his side. Another witness testified that, immediately after the killing, he found Bryeans' knife shut in his pocket. Breysacher also gave testimony to the effect that Bryeans called him a liar when he accused him of frequently interfering with Skinny Morgan by talking to him. If this be true, the jury was warranted in concluding that the fight ensued in relation to appellant's business. Of course, there is testimony tending to show to the contrary, but unless the undisputed evidence in the present record showed that the quarrel ceased and took a personal turn, and that the killing ensued on account of personal matters wholly disconnected from the company's business, it would not be within the province of this court on appeal to interfere with the verdict of the jury.

The fourth suggestion is that the undisputed evidence now shows that, after the quarrel began, it came to a conclusion through the effort of F. W. Schatz and was renewed through the fault of Bryeans; whereas it was a disputed question of fact on the former trial whether the quarrel ceased and was renewed through the fault of Bryeans. J. A. Breysacher did not testify on the first trial. He gave testimony on the second trial to the effect that, after he had charged Bryeans with interfering with his men, Bryeans became angry and ran his hand in his right-hand pocket; that F. W. Schatz, assistant superintendent, stepped in between them and stopped the controversy by telling Bryeans that Breysacher had authority over the men in the mill, and that he would have to obey Breysacher's instructions with reference to talking to them; that he, Breysacher, dropped out of the controversy entirely; that, after stopping the difficulty, F. W. Schatz started away, but that Bryeans then renewed the difficulty by calling him (Breysacher) a G— d— liar; but he also testified that at the time Mr. Schatz parted them, Mr. Bryeans said he would see Mr. Lange as to whether he (Breysacher) had authority; that Mr. Schatz told him that Breysacher had authority and that he (Bryeans)

would have to abide by it; that he (Breysacher) also told Bryeans that there was no use to see Mr. Lange; that he had the authority and Bryeans would have to do as he said; that Bryeans said he would not do it, and Breysacher said, "You will;" that Bryeans said he did not bother his men; that he then charged him with talking to Skinny Morgan nearly every day, at which time, Bryeans said, "You are a G— d— liar;" that he (Breysacher) responded, "You are another one;" that these were the last words that took place before the killing. If the jury accepted as true the last version of the killing, detailed by Breysacher, then it can not be said that the undisputed evidence showed that there was any real cessation of the quarrel, and that it was renewed through the fault of Bryeans.

After a careful analysis of the evidence, we have concluded that appellant's alleged four points of difference between the evidence on the first and second trials are not well taken. We think the evidence on both trials alike in all material essentials.

This brings us to a consideration of whether the case was sent to the jury under proper instructions. Appellee requested, and the court gave, over specific objections of appellant, instruction No. 3, which is as follows:

"If you find that Breysacher and Bryeans became involved in a quarrel by Breysacher remonstrating with him about talking to or interfering with the labor in the box factory, and if you further find that the quarrel was continuous up to the time of the killing, and if you further find that the killing grew out of such quarrel, then Breysacher at the time of the killing was acting in the scope of his employment, and you will return a verdict for the plaintiff, unless you find that he was acting in his necessary self-defense."

The undisputed evidence on both trials showed that the quarrel orignated by Breysacher telling Bryeans that he would have to stop bothering the men in the shop by talking to them. In laying down the law, on former ap-

peal, applicable to the facts, this court assumed the undisputed evidence as true and said: "If the quarrel which was started by Breysacher in telling Bryeans that he would have to stop bothering the men in the shop was continuous to the time of the killing, and the killing grew out of such quarrel, then Breysacher at the time of the killing was acting in the scope of his employment."

This declaration of law ruled the case on the second trial, and it was the duty of the trial judge, in instructing the jury, to frame instructions in keeping with this declaration. This declaration of law was based on the theory that the quarrel was begun by Breysacher in attempting to enforce a rule to prevent outsiders from interfering with his men, which effort was within his authority, and that the quarrel, thus begun, continued and resulted in the killing of Bryeans unnecessarily by Breysacher.

The evidence in both trials tended to establish this state of case; hence, appellee was entitled to an instruction covering this theory. We, therefore, see no error in the refusal of the court to include in this instruction appellant's theories (1) that, after the quarrel began, it ceased and took a personal turn, and (2) that, after the quarrel began, it was stopped through the intervention of Schatz and renewed and continued through the fault of Bryeans. Both these theories are separate and distinct theories from the theory contended for by appellee, and, being separate and distinct theories, it was proper, as was done, to present the several theories in separate instructions. Neither was it error to exclude from the instruction appellant's contention that it was not liable for Breysacher's act unless he was attempting to prevent a present infraction of the rule not to talk to his men. The evidence showed on the first trial that Breysacher took Bryeans to task for having talked to his men, especially Skinny Morgan. It is true that he also told Bryeans he would have to quit giving orders to "that negro up there" but there was nothing to indicate when the orders were given. Notwithstanding the evidence on the first trial

failed to show a present infraction of the rule, this court said, and it became the law of the case:

"If the quarrel which was started by Breysacher in telling Bryeans that he would have to stop bothering the men in the shop was continuous to the time of the killing, and the killing grew out of such quarrel, then Breysacher at the time of the killing was acting in the scope of his employment."

It was said when the case was here on former appeal that: "The issue as to whether Breysacher was justified or excused in commiting the homicide, in so far as that issue concerns the appellee, is not presented by this appeal."

That issue in the case now before us was safeguarded in the latter clause of instruction No. 3 which told the jury that, if Breysacher was acting in necessary self defense, appellant would not be responsible.

Appellant also insists that the court erred in giving instruction No. 6, which was requested by appellee. That instruction was as follows:

"If you find from a preponderance of the evidence first, that Breysacher and Bryeans became involved in a quarrel by the one remonstrating with and complaining to the other about his talking to or bothering the men in the shop; and, second, if the quarrel thus started continued up to the time of the killing, or that it ceased and was thereafter renewed by Breysacher or by Bryeans without fault on the part of Bryeans, and then continued up to the time of the killing; and third, that the killing of Bryeans by Breysacher was the result or climax of said quarrel, your verdict will be for the plaintiff, unless you find that Breysacher was acting in his necessary self-defense."

In addition to the same objections urged to instruction No. 3, which in our opinion were not tenable for the reason heretofore given, appellant challenges the correctness of this instruction because it placed liability on the company if the quarrel ceased and was renewed by Breysacher or by Bryeans without fault on the part of Bry-

eans, if the quarrel continued until the time of the killing and the killing was the climax of the quarrel. The word "renewed," as used in the instruction, had reference to the beginning and continuance of the same quarrel, and not a quarrel pertaining to some matter disconnected from the company's business. Giving the instruction this interpretation, which is its only and natural meaning, it is quite clear that the instruction conforms to the law laid down by the court on former appeal. This court said, on former appeal of this case that "if the quarrel which was started by Breysacher in telling Bryeans that he would have to stop bothering the men in the shop was continued to the time of the killing, and the killing grew out of such quarrel, then Breysacher at the time of the killing was acting in the scope of his employment."

And also said: "But if the quarrel which was thus started had ceased for an appreciable interval, however short, and was then renewed through the fault of Bryeans, and the killing was the result of the quarrel thus renewed by Bryeans, then Breysacher at the time of the killing was not acting within the scope of his authority."

In short, the law of the case declared on former appeal is, that, if the quarrel was begun or renewed by Breysacher pertaining to the company's business and continued until the killing and the killing was the climax of the quarrel, then the company would be responsible, even if Bryeans resented Breysacher's effort and cursed him, unless Breysacher was forced to kill Bryeans in necessary self-defense; and further, if the quarrel thus begun was stopped by F. A. Schatz, assistant superintendent of appellant company, and renewed by Bryeans without fault on Bryeans' part (meaning, of course, in reference to the company's business), and the quarrel continued until the killing, and the killing was the climax of the quarrel, then appellant would be responsible, unless Breysacher killed Bryeans in necessary self-defense.

Appellant insists that instructions Nos. 3 and 6, given by the court, conflicted with instruction No. 8, requested by appellant and given by the court as No. 4. Appel-

lant's request No. 8, given by the court as No. 4, is correct only upon the theory that there was a cessation of the quarrel originally started, and a renewal thereof touching some matter not pertaining to the company's business. We think No. 8 was predicated upon the theory that there was such a cessation of the quarrel. In this view, there is no conflict between the instructions, because they present separate and distinct theories of the case.

Appellant insists that the court erred in refusing to give its requested instruction No. 3. The instruction was erroneous in that it acquitted the company of liability if Breysacher thought Bryeans was making, or was about to make an assault on him at the time of the killing. Unless Breysacher's belief was predicated on good grounds, the law would not excuse the compnay from liability for the killing if it was the outgrowth of a quarrel commencing and continued in an attempt by Breysacher to prevent Bryeans from talking to the men in the box factory near by, or the negro employee near them.

Appellant insists that the court erred in refusing to give its requested instruction No. 4. It carried the same error as appellant's requested instruction No. 3, and was properly refused.

Appellant insists that the court erred in refusing to give its requested instruction No. 6. That instruction exempted appellant from liability if the controversy which resulted in the killing arose out of a past, and not a present, interference of the rule against talking to the men in and about the box factory. The instruction was properly refused, because it conflicted with the following declaration by this court on former appeal of this case:

"Breysacher was acting within the line of his duty when he told Bryeans that he would have to quit giving orders to that negro up there, and when he told him that he had been bothering the men in the shop."

Appellant insists that the court erred in refusing to give its requested instruction No. 10, which is as follows:

"If you find from the evidence that Bryeans provoked a difficulty with Breysacher, either by calling him a liar, or by making a threatening demonstration against him, and that Breysacher killed Bryeans solely on that account, then your verdict should be for the defendant."

The instruction, as requested, acquitted appellant of liability if its foreman, Breysacher, killed Bryeans because Bryeans called him a liar concerning the enforcement of the company's rules which Breysacher was authorized to enforce. Such is not the law. If Breysacher killed Bryeans because Bryeans called him a liar in a controversy concerning the transaction of business for appellant, within the scope of Breysacher's authority, then appellant was liable for the tort. So, the instruction was erroneous and properly refused, because it acquitted appellant from liability in any event if Breysacher killed Bryeans for calling him a liar.

Appellant insists that the court erred in refusing to give one or the other of appellant's requested instructions Nos. 11 and 12. It is unnecessary to set these instructions out for the reason that the court did give requested instruction No. 11 as No. 15.

Appellant insists that the court erred in refusing to give its requested instruction No. 14, which is as follows: "You are instructed that Breysacher had the right under the law to speak to or accost Bryeans in an ordinary and usual way about a real or fancied violation of a rule of the defendant which it was Breysacher's duty to enforce; and if you find from the evidence that Breysacher did so accost Bryeans about such a matter, and that Bryeans became angry because he was thus accosted, and on account of such anger a quarrel ensued which resulted in the killing of Bryeans, then your verdict should be for the defendant."

This instruction exempted appellant from liability if its foreman, Breysacher, was acting within the scope of his authority, and the quarrel and a killing ensued and resulted because Bryeans became angry in the course of the controversy. It was immaterial how angry Bryeans

became, or how abusive he was toward Breysacher. · His only defense, and the company's only exemption, could be founded in the necessary killing of Bryeans by Breysacher. Anger and abusive language will in no event justify an assault. Such language can only go in mitigation of damages. *Ward* v. *Blackwood,* 41 Ark. 295; *LeLaurin* v. *Murray,* 75 Ark. 232; *Cooper* v. *Demby,* 122 Ark. 266.

Lastly, appellant contends that there is no occasion or excuse for punitive damages being allowed in this case.

There was evidence tending to show that the quarrel resulted from an attempt on the part of Breysacher to enforce a rule of the company against interference with its employees, which right, on Breysacher's part, was within the scope of his authority, and that the quarrel continued until the killing, and that Breysacher killed Bryeans at a time when he was six feet from him, standing still, with his hands down by his side. If the jury accepted the testimony which tended to establish these facts, then there was no occasion nor excuse for the killing. We are not willing to say that $3,000 is too large a judgment by way of punishment for the killing without justification.

No error appearing in the record, the judgment is affirmed.

HART and SMITH, JJ., dissenting.