LUNDELL *v.* WALKER.

4-6842                                                        165 S. W. 2d 600

Opinion delivered October 26, 1942.

*Bridges, Bridges & Young* and *Henry W. Gregory, Jr.,* for appellant.

*K. T. Sutton* and *John C. Sheffield,* for appellee.

GRIFFIN SMITH, C. J. Arkansas Workmen's Compensation Commission ruled in favor of the claimant, widow of Henry Walker, and circuit court affirmed.

Sam Scott, Lundell Plantation foreman whose duty it was to supervise clearing new ground, shot and killed Walker about six o'clock the morning of February 10, 1941. George Brandon, superintendent for E. W. and Raymond Lundell,[1] employed Walker in December, 1940, and assigned him to a "bulldozer" used in the work he had undertaken..

Scott's explanation was that because of Walker's inefficiency or indifference, the hourly wage of 75 cents paid during December was reduced to 50 cents January 1. Walker was dissatisfied to such an extent that it was thought best to dispense with his services and employ a substitute more agreeable and more willing. Scott wrote Brandon February 7, outlining Walker's deficiencies, and was immediately authorized to exercise the right of discharge.

Scott regularly carried a pistol because required to pass through sparsely populated areas before daylight and after dark. The shooting occurred within 30 or 40 feet of L. D. Bellah's home, near a bridge over a bayou. Scott lived three and a half miles from Bellah. Walker, who occupied an automobile house-trailer, had it stationed back of Bellah's home, on the west side of the bayou. Scott says that when he left home at five o'clock he rode to the residence of B. Dees on the east side of the bayou and tied his horse to a post. It required thirty or thirty-five minutes to make the trip. Scott passed the trailer, traversed the bayou bridge, and waited at Dees' home about five minutes before Walker appeared. He insists that Walker came "right opposite me; whereupon I called to him and said, 'Mr. Walker, I am going to have to let you go this morning.' He said, 'What is the trouble?' I replied, 'Your work is just not satisfactory.' "

Continuing, Scott testified he then noticed Walker's voice was quivering; so he turned away and untied his

---

[1] Lundell Plantation was owned by E. W. and Raymond Lundell.

horse, but did not mount. Walker followed and said, "If you ever 'fire' me I am going to beat you to death." Walker is then alleged to have struck Scott in the mouth, almost knocking him down. A scuffle ensued and Scott says he was knocked down:—"I then pulled my gun and told Walker to get off. When I got up I started toward the bayou, with Walker following. He was cursing and threatening to kill me. Walker obtained a stick and ran after me. He followed me across the bridge and almost caught me. At that time I turned and shot him once.[2] I bumped into my horse on the west side of the bridge, but do not know how the animal got there. I called Bellah and told him I had shot Walker."

Mrs. L. D. Bellah testified that Walker and his wife "came over to our house" Saturday night preceding the shooting. They had been informed Scott had told Bill Dees "they" were going to kill Walker or fire him. Walker said he was not afraid, that he had confidence in Brandon.

Mrs. Bellah says she was awakened early and heard Scott ride up in front of the door. The witness had just hung some "ticking" over a window. She looked out and told her husband to get up and build a fire—"they are waiting on you now." Just as Mrs. Bellah spoke to her husband, or about that time, she heard Walker on the bridge coming toward her house. Her testimony is that ". . . he walked on across the bridge [and then] Scott rode his horse right up to the end of the bridge. That is where the shooting occurred. I saw Scott ride up to the bridge, with his horse's head on it. The bridge rattles when it is used. I couldn't see Scott's gun when he fired, but I saw him on the horse. . . . I could see Walker's feet under the horse, but not his body. . . . He shot [Walker] as he was standing on the last board of the bridge. . . . The killing took place a very short time after the two men met—not over two minutes."

In detailing the conversation she claimed to have heard, Mrs. Bellah said: "Scott, when he rode up in front of Henry, told him he had a new man to put on

---

[2] The bullet entered an eye and ranged down toward the neck.

the bulldozer. Henry replied, 'Mr. Brandon hired me, and he will tell me to get off.' Scott then said: 'I told you I have another man, and you are not going out there.' Henry told Scott to 'put that gun up, fellow, because I'll make you eat it.' That was the last sign he made.'' Immediately after Walker told Scott to put his gun away, Scott fired, then rode up to the Bellah home and stated that he had shot the man. Mrs. Bellah also said that when Scott was standing by the porch his nose bled. He wiped it off with a handkerchief. Scott's face was not bloody: didn't have a scratch on it:—''Henry Walker did not raise a hand to fight him, or do anything to him.''

## OTHER FACTS—AND OPINION

Other testimony was given, favorable to each side. It is in evidence that Scott had a bruised face and scratches when seen shortly after the shooting. He crossed the bayou at a point below the bridge. Appellee attaches significance to the fact that Scott had been in the habit of riding a spirited black horse, but the morning Walker was killed a different mount was utilized. It was also ridden by Scott the following day. Mrs. Bellah admitted she did not tell all she knew when questioned during a preliminary hearing to determine whether Scott should be held on a criminal charge. Explanation was that she didn't want to get mixed up in the affair, and that certain direct questions were not asked.

Appellants concede that findings of facts by the compensation commission are, on appeal, given the same verity that would attach to a jury's verdict, or to facts found by the judge of the circuit court where a jury was waived. But, it is insisted, ''the material and pertinent facts necessary for a determination of the case are not contradicted.''

We are reminded, first, that the object sought to be attained by Act 319 of 1939 was to compensate employes, (in case of injury) or dependents, (in case of death) when injury or death occurred while the employer-

employe relationship existed. The injury, whether limited or productive of death, must occur while the employe is engaged in the master's business. It is argued, therefore, (a) that Walker was not an employe of the Lundells when he was killed; (b) that his death "did not arise out of or in the course of his employment," and (c) that he was the aggressor.

It is certain Scott had authority to discharge Walker, although perhaps Walker had not been informed that Brandon had delegated the power. In what manner, then, did Scott exercise that right?

Under any reasoning based upon the facts, Walker was not given time to quit the premises between notice of discharge and Scott's use of the pistol. His trailer was on Lundell property, and even though the unfortunate man were called from his living quarters and summarily dismissed before starting to work, the conversation and act of killing were so much a part of the same transaction that discrimination cannot differentiate between them. Scott was serving his employers when, at an early morning hour, he rode more than three miles to transmit to Walker the ultimatum, and while Brandon did not, of course, intend that the authority to discharge should be coupled with violence, yet the agent he selected killed Walker while the master's commission to bring about a desired result was being executed.

A general rule, appropriately expressed by Judge Cooley, is that where a servant acts without reference to the service for which he is employed, and not for the purpose of performing the work of the employer, but to effect some independent purpose of his own, the master is not responsible for either the acts or omissions of the servant. The converse is that when the servant acts with reference to the services for which he is employed and for the purpose of performing the work of his employer, and not for any independent purpose of his own, but merely for the benefit of his master, acts done in such circumstances are within the scope of the servant's employment. *Bryeans, Administratrix,* v. *Chicago Mill & Lumber Company,* 132 Ark. 282, 200 S. W. 1004. See,

also, *Chicago Mill & Lumber Company* v. *Bryeans,* 137 Ark. 341, 209 S. W. 69. These cases are cited in *American Railway Express Company* v. *Mackley,* 148 Ark. 227, 230 S. W. 598.

In *Robinson* v. *St. Louis, I. M. & S. Ry. Co.,* 111 Ark. 208, 163 S. W. 500, it was held that the railway company was liable for the wilful or malicious acts of its servant when they were done within the course of the servant's employment, and within its scope. See first headnote at page 208 of the Arkansas Report, and cases cited at pages 213 and 502 of 163 S. W.

Whether, in respect of a particular transaction, the servant acted with reference to the services for which he was employed as distinguished from an independent purpose of his own, is ordinarily a question of fact referable to a jury when the right is not waived. In the instant case the period between discharge and death was too transitory to justify the claim that Walker was not an employe when shot.

The greatest difficulty is confronted when consideration is given evidence of a substantial nature indicating wilfulness, and, inferentially, a malignant design upon Scott's part. Certainly, if Scott killed because of a personal grudge and took advantage of his status as foreman to punish Walker, the circuit court erred in affirming the commission's award. On the other hand, if during conversation immediately preceding Scott's act he became excited, irrational, or unreasoning because of a purely imaginary danger, and fired while under mistaken apprehension his life was in danger, or that great bodily injury might be sustained, responsibility would attach to the masters. This was a question of fact, and it has been decided by the commission in claimant's favor. It is true there was no evidence other than circumstances attending the meeting, and its result, showing that Scott fired impulsively; but these circumstances must be considered in connection with testimony of witnesses, at least one of whom claims to have seen Scott on horseback when the shot was fired. The commissioners seemingly believed Mrs. Bellah; nor is her story of having

witnessed preliminaries, and Scott's subsequent deportment, more improbable than that of the killer because of semi-darkness. Scott testified to having seen Walker chasing him, with a club or a stick in his hand. The commissioners probably thought that if Scott, armed with a pistol, and in flight, could identify a weapon in his pursuer's possession, Mrs. Bellah could see a horse and two men.

An attorney's fee of $500 was allowed, to be deducted from final installments due appellee. The statement is made by appellee's attorneys that ". . . [Mrs. Walker] has stated to her attorneys that she has no objection to an allowance of the maximum of 25 per cent., as she feels the amount has been earned." This would be largely in excess of $500. While we do not question accuracy of this declaration, there is no testimony regarding the fee; nor was sufficiency of the allowance questioned by cross appeal.

Judgment affirmed.