MEYER *v.* SEISMOGRAPH SERVICE CORPORATION.

4-7715                                      189 S. W. 2d 797

Opinion delivered October 22, 1945.

*Chas. C. Wine* and *Alston & Woods,* for appellant.

*Shaver, Stewart & Jones,* for appellee.

HOLT, J. January 22, 1944, L. J. Meyer of El Dorado, Arkansas, sustained an accidental injury near Smackover, Arkansas, arising out of and in the course of his employment, which resulted in his instant death. He was 34 years of age at the time of his death and unmarried. Appellants, J. J. Meyer, Elizabeth Meyer and Jeanette Meyer, are the father, mother and sister respectively of the deceased, and filed claim for an award of compensation before the Workmen's Compensation Commission (Act 319 of 1939).

Upon a hearing, the Commission denied the claim on the ground that dependency had not been established, and this finding of the Commission was affirmed on appeal to the Union circuit court, second division. This appeal comes from the judgment of the circuit court.

The sole question to be determined here is whether appellants established dependency within the meaning of the Workmen's Compensation Law, *supra.* In other words, was dependency shown at the time of L. J. Meyer's injury and death?

In the recent case of *Crossett Lumber Company* v. *Johnson,* 208 Ark. 572, 187 S. W. 2d 161, we held that the question of dependency is one of fact, and that one is a dependent within the meaning of the act (Headnote 4) "if he relies for support in whole or in part upon the aid of another." The rule is firmly established that the findings of the Commission, which is the trier of the facts, will not be disturbed on appeal to the circuit court if supported by substantial testimony. Act 319 of 1939, § 25b;

*Hughes* v. *Tapley, Administratrix,* (1944) 206 Ark. 739, 177 S. W. 2d 429; *Baker* v. *Silaz* (1943), 205 Ark. 1069, 172 S. W. 2d 419; *Solid Steel Scissors Co.* v. *Kennedy* (1943), 205 Ark. 958, 171 S. W. 2d 929; *Birchett* v. *Tuf-Nut Garment Mfg. Co.* (1943), 205 Ark. 483, 169 S. W. 2d 574; *Hunter* v. *Summerville* (1943), 205 Ark. 463, 169 S. W. 2d 579; *J. L. Williams & Sons, Inc.,* v. *Smith* (1943), 205 Ark. 604, 170 S. W. 2d 82; *Lundell* v. *Walker* (1942), 204 Ark. 871, 165 S. W. 2d 600.

In one of our most recent cases, that of *Ozan Lumber Company* v. *Garner*, 208 Ark. 645, 187 S. W. 2d 181, we reaffirmed this rule, and there said: "In a long line of decisions since the passage of the act here in question, the rule has been clearly established that the findings of the Commission shall have the same binding force and effect as the verdict of a jury, or of a circuit court sitting as a jury, and when supported by substantial evidence, such findings will not be disturbed by the circuit court on appeal to that court or on appeal to this court."

It will be noted that the act provides (§ 15, subdivision (h)) that "all questions of dependency shall be determined as of the time of the injury." With these controlling rules of law before us, after a careful review of all the testimony, we are unable to say as a matter of law, that there was no substantial testimony presented on which the Commission based its findings. In other words, we cannot say that the undisputed proof shows dependency.

The evidence presented shows that J. J. Meyer (the father) owned a 32-acre tract of land near Walters, Oklahoma, on which he and his wife and daughter resided. This farm produced a small amount of revenue from the sale of milk, eggs and chickens. The family maintained a flock of about 70 chickens, two cows and a span of horses. Until July, 1943, J. J. Meyer was engaged in the carpenter's trade, earning from six to seven dollars per day. In July, 1943, his vision became so impaired that he was unable to continue work and an operation on his eyes became necessary. At the time of the son's death, J. J. Meyer testified: "I wasn't totally broke when he

died, I had something like six or seven hundred dollars,'' and in addition, he had two or three $25 War Bonds. On December 13, 1943, Mrs. Meyer received a $20 check from L. J. Meyer, and the daughter a $10 check, and in addition, he sent his father a check for $193 to defray the expense of the operation upon his eyes. The daughter had not cashed her check at the time of the hearing in this case. In 1940, L. J. Meyer opened a bank account and authorized his father and mother to check on it. Canceled checks were produced in payment of insurance premiums on the life of the deceased, drawn by the father. Shortly after the son's death, J. J. Meyer withdrew the balance in the son's bank account, in the amount of $1,584.31, which he deposited in his own account. The mother, Mrs. Meyer, received $2,000 from the son's insurance, which was deposited in the joint account of herself, the father, J. J. Meyer, and their daughter.

Besides L. J. Meyer, there were four other children, Carl Meyer, manager of the Long-Bell Lumber Company, Walters, Oklahoma; Cletus Meyer, employed by the Sinclair Refining Company; Mrs. Beatrice Brumley, a married daughter, and Alvin, who is in the armed forces.

J. J. Meyer testified: "Q. What were you doing before July, 1943? A. I was following the carpenter's trade. Q. What did you usually earn, per month, in that trade, Mr. Meyer? A. Well, it is difficult to say; I earned good money, but I could not say exactly how much. Q. Approximately how much? A. While I worked, something like about $6.50 or $7.00 a day. Q. Did you work regularly? A. Pretty steadily. I had all the work I wanted. I didn't work steady, on account of my age; but I always had plenty of work. I worked when I could. I worked enough to keep us going and living anyway. . . . Q. Now, after your eyes went bad in July or August, 1943, and you were unable to work, how much per month, or approximately how much per month, did your deceased son contribute towards your support? A. I can figure it. I can tell you within a dollar what he contributed from September to the time that happened. Q. All right, tell us. A. $193 and $30 would be what? Q. $223. A. Yes, sir, that

is it, within 25 cents, I guess. Q. Then, he contributed approximately $223 for the five or six months? A. No, sir; it wasn't any six months. When did that happen? A. January 22, 1944. A. Well, he didn't contribute anything in January, because he hadn't got his pay. Q. Then to what time? A. We will say, from January 1st. Q. From the time your eyes went bad in July or August, 1943, until January 1, 1943, he had contributed approximately $223? A. Yes, sir." "Mr. Brumley: (interrupting). We have a different time limit (period). He is talking about from November. Claimant: (Witness) No, sir; from the 1st of September to January; and then, during that time; I want to tell you, during that time Mr. Brumley gave us $150; I believe he will substantiate that. Mr. Steward: (continuing) Q. Does that $223 include what he sent to all of you? A. Yes, sir; all of us. Q. In other words, he sent $223 to you and your wife? A. And the daughter. Q. And the invalid daughter; that is, his sister? A. Yes, sir."

It was stipulated that if Elizabeth and Jeanette Meyer were personally present to testify their testimony would be substantially the same as the testimony of the father, J. J. Meyer.

Appellants testified before the Commission that the deceased sent some money to them by wire, and in cash in letters to the mother, other than that sent by the three checks, *supra,* and that the father drew checks on the deceased's bank account besides the insurance checks. The son-in-law, Brumley, and C. T. Meyer, a brother of the deceased, testified that they read letters from the deceased to the family which indicated money was being sent. It was evident, however, that this testimony was not credited by the Commission, as indicated by the statement, contained in its findings of fact, which was to the effect that evidence tending to substantiate these contributions and claim of dependency was not offered, such as canceled checks, amount of cash, records of telegrams, and the letters as the best evidence. The evidence of appellants, since they were interested parties, cannot be held to be undisputed. In *Bridges* v. *Shapleigh Hard-*

*ware Company,* 186 Ark. 993, 57 S. W. 2d 405, we held: (Headnote 6) "The testimony of an interested party will not be regarded as undisputed in determining the legal sufficiency of his evidence, and in weighing his testimony, his conduct and the attendant circumstances may be considered." See, also, *Davis* v. *Oaks,* 187 Ark. 501, 60 S. W. 2d 922.

The Commission had the right, just as a jury would have had, to believe or disbelieve the testimony of any witness.·

Giving to the evidence its strongest probative value in favor of appellees, as we must do, we cannot say that it is not substantial. The evidence was sufficient to warrant a finding by the Commission that the money sent to appellants by the deceased was intended as gifts only and that dependency within the meaning of the act was not shown.

Finding no error, the judgment is affirmed.

ROBINS, J., dissenting. There was no conflict whatever in the testimony in this case. The situation reflected by the record here is this: The deceased was an unmarried man, 34 years old, who had promised to support his parents, and had actually begun to make substantial contributions to them. His father was 67 years old and blind; and his mother was 66 years old. A banker who lived in the same locality, conversant with their financial condition, and who was entirely disinterested, stated that this couple did not have sufficient income to live on. His testimony was nowhere contradicted. The only specific testimony as to the amount of their income showed it to be $10 per month. Their poverty was accentuated by the fact that they were trying to care for a helpless daughter. This father and mother had a right under the laws of this state (§ 7603, Pope's Digest) and under the laws of God (Deuteronomy, chap. 5, 16th verse) to look to this son for support in their old age; and everything in the record indicates that this son, if he had not lost his life as a re-

sult of his employment with appellee, would have done his duty by his parents. If this does not present a picture of dependency I would not know how to draw one.

In the case of *Crossett Lumber Co.* v. *Johnson,* 208 Ark. 572, 187 S. W. 2d 161, it was held that "C. M. Johnson and his wife were dependents of Raymond E. Johnson." The evidence showed C. M. Johnson was working, and that his annual gross income from wages was $1,662.52, and that the deceased, Raymond E. Johnson, his 22-year-old son, who was living at home with his parents, made a contribution of $6 per week and other contributions to the expenses of the family, it not being shown what the board and room enjoyed by Raymond was worth.

In the case of *Arthur Murray Co., Inc., et al.,* v. *Mrs. Agnes M. Cole, ante,* p. 61, 189 S. W. 2d 614, we held that Mrs. Agnes Cole was a dependent of Bobby Cole, deceased. There the evidence showed that Bobby Cole was the sixteen-year-old son of Neal Cole and his wife, Agnes Cole; that Neal Cole was making $100 per month and Mrs. Cole was earning at least $3 a week.

It is urged that these cases are not controlling here, because in both of them the Workmen's Compensation Commission had made an award in which dependency was found to exist. Conceding for the sake of argument that the finding of the commission on a disputed issue of fact is binding on the court, this rule ought not to be extended to cases where, as in the case at bar, there is no dispute as to essential facts.

Since there is no conflict in the testimony, and the testimony shows that the father and mother were at least partially dependent on their son at the time of his death, I think the award of the commission and the judgment of the lower court affirming it ought to be reversed.