TRIEBSCH *v.* ATHLETIC MINING & SMELTING COMPANY.

4-9420                                     237 S. W. 2d 26

Opinion delivered February 19, 1951.

Rehearing denied March 19, 1951.

*Gutensohn & Ragon* and *Franklin Wilder*, for appellant.

*Daily & Woods,* for appellee.

ED. F. McFADDIN, Justice. This is a claim by appellant against appellee for a compensation award under the Arkansas Workmen's Compensation Law (see § 81-1301, *et seq.,* Ark. Stats.).

At all times herein, appellee operated a smeltery for processing zinc ore. In the plant, two furnaces were located in each of five buildings or "blocks." Furnaces 1 and 2 were located in Block 1, which was the most westerly block. In the smeltering process the ore·was heated in the furnaces in order to remove impurities; and the fumes from the heated ore escaped through condensers along the side of the furnaces. After the "cooking" was completed, the refined product was available for further processes of manufacturing. Each "block" was equipped with doors on each side and end of the building; and at times doors were opened to allow ventilation in the block and to aid the removal of smoke and gaseous fumes. Temperature and weather affected the smoke and gas conditions within each block: that is to say, these conditions were worse at night than in the daytime; they were worse in cold than in warm weather·and they were worse in humid than in dry weather. The management had respirators available for the use of employees desiring them.

For about nineteen years appellant (also referred to as claimant) was employed by appellee (also referred to as employer) as a fireman of some of the said furnaces at the smelting plant. In 1944, it was discovered that claimant's breathing was impaired and the doctor diagnosed his trouble as bronchial asthma or. bronchiectasis; but appellant continued to work and inhale the fumes and smoke until his collapse, shortly to be mentioned. Appellant reported for work as a fireman of the furnaces in Block 1 at 10:00 p. m. on the night of January 28, 1949, and was to work until 6:00 a. m. of January 29th. In the course of his work on that night appellant collapsed and suffered a physically disabling attack, or breakdown, so that he is now totally and permanently disabled.

Appellant's claim was filed with the Workmen's Compensation Commission on May 11, 1949, and resulted in three hearings: the first was by Commissioner Caperton at Fort Smith on June 22, 1949; the second was by Commissioner Holmes at Fort Smith on December 15,

1949; and the third hearing was before the entire Commission at Little Rock on May 23, 1950.

At the first hearing, the employer sought to defeat the claim as not having been filed within the time provided by § 14 (c) (1) and § 17 of the Workmen's Compensation Law (as found in §§ 81-1314 and 81-1317, Ark. Stats.). The Commission was correct in overruling such contention of the employer; because the evidence showed that on January 29, 1949 (the day after appellant's collapse) Mr. Dean, appellee's foreman, knew of the claimant's disability, and on February 28th told the appellant that he could not work any longer and advised him to obtain benefits under a total disability life insurance policy which appellant was carrying. Furthermore, some time later, appellant inquired of the president of the appellee company as to Workmen's Compensation benefits. In view of the foregoing, we hold that the employer had timely knowledge of the claimant's injury; and that the provisions of § 81-1317, Ark. Stats., required the overruling of the employer's motion to dismiss the claim.

Likewise, at the first hearing, the employer sought "to require claimant to amplify his claim to state whether the claim is based upon an *accidental injury* or an *occupational disease*. . . ." The Commission was correct in overruling this motion which was designed to make the claimant elect under what particular section of the Workmen's Compensation Law he was seeking to recover. We have many times held that the Workmen's Compensation Law should be broadly and liberally construed; and that doubtful cases should be resolved in favor of the claimant. See *Hunter* v. *Summerville,* 205 Ark. 463, 169 S. W. 2d 579; *Elm Springs Canning Co.* v. *Sullins,* 207 Ark. 257, 180 S. W. 2d 113; *Nolen* v. *Wortz Biscuit Co.,* 210 Ark. 446, 196 S. W. 2d 899; and *Batesville White Lime Co.* v. *Bell,* 212 Ark. 23, 205 S. W. 2d 31.[1] In the case at bar the appellant was entitled to have the facts submitted to the Commission on any provision of the Workmen's Compensation Law that would justify an award

[1] For other cases so holding, see West's Arkansas Digest, "Workmen's Compensation," Cumulative Pocket Part, §§ 51 and 52.

in his favor; and the technical motion to require him to "elect" is not within the purview of that Law.

We believe that this "election" matter was one of the major factors which caused the Commission to fail to make an award for the claimant. That the Commission at all times was thinking in terms of *occupational disease* — rather than *accidental injury* — is clearly apparent:

(1)   At the first hearing before Commissioner Caperton, we find this in the record:

"BY COMM'R. CAPERTON:

"Q.   I am going to ask a question and I don't want any objections to it because I am asking it for a purpose. Do you know, in the 19 years of your employment at the Athletic Mining and Smelting Company of any person that has suffered or has a disability as a result of breathing any of the ingredients at the smelter?

"A.   No.   I couldn't say as I do."

(2)   Again, when a witness, who was also a fellow workman with the claimant, was testifying at the first hearing, we find this in the record:

"BY COMM'R. CAPERTON:

"Q.   Do you work pretty close to Mr. Triebsch?

"A.   Yes sir.

"Q.   Have you had any trouble breathing fumes out there?

"A.   No sir."

(3)   After the conclusion of the first hearing, and at the suggestion of Dr. Cull [2] and the Commission, ten fellow employees of the claimant were examined to see whether any of them suffered from symptoms of an oc-

---

[2] Near the conclusion of the first hearing, the Commissioner said, as regards an examination of the claimant:

"I am not going to order it now.   I want to talk to Dr. Cull and I want to find out if he is really qualified to make such an examination."

cupational disease. Likewise the University of Arkansas was requested and did make a report on fume conditions at the employer's plant.

(4) A great variety of medical and other expert evidence was thus accumulated and heard on the matter of *occupational diseases*. All sorts of hypothetical diseases were discussed in the hearings. At least eight doctors were consulted in one way or another; and the Commission's fifteen page opinion of August 25, 1950, contains statements like this:

". . . According to Mr. Robertson's testimony he had been employed as a fireman at the respondent's plant for thirty (30) years, and had worked close to the claimant during the past several years. It was also the testimony of Mr. Robertson that he had no breathing trouble. . . ."

(5) Furthermore, Dr. Cull's various reports are quoted in the opinion of the Commission, and from these reports we notice the following excerpts:

"All in all, I can find nothing in these reports of Dr. Martin as to history and findings which one would not expect to find in a group of workmen engaged in similar occupations and in which no dust, gas or fume hazards are involved, and in which men work under conditions in which they are subjected to similar changes of temperature, drafts, etc., as, for instance, would be the case in the semi-open sheds used in many manufacturing industries.

. . . . .

"As a result of all these ailments, I regard Mr. Triebsch as totally and permanently disabled, but do not feel that any of these ailments has resulted from his occupation or the nature of his employment."

We have dwelt on the *occupational* phase in this case in considerable detail, because the Commission, on its own initiative, spent several months on the question of *occupational* conditions, and we are convinced that the trend of the hearing caused the Commission to base its

opinion on that point. There is substantial evidence to support the Commission's finding that the claimant in this case is not suffering from an *occupational disease;* and the Commission's findings on that phase of the case is final. See *Lundell v. Walker,* 204 Ark. 871, 165 S. W. 2d 600; *J. L. Williams & Sons, Inc.* v. *Smith,* 205 Ark. 604, 170 S. W. 2d 82; and *Tinsman Manufacturing Co.* v. *Sparks,* 211 Ark. 554, 201 S. W. 2d 573.[3]

But on the *accidental injury* phase of the case, the uncontradicted evidence shows that the claimant suffered an *accidental injury* within the purview of our cases, such as: *Herron Lumber Co.* v. *Neal,* 205 Ark. 1093, 172 S. W. 2d 252; *McGregor* v. *Arrington,* 206 Ark. 921, 175 S. W. 2d 210; *Harding Glass Co.* v. *Albertson,* 208 Ark. 866, 187 S. W. 2d 961; *Sturgis Brothers* v. *Mays,* 208 Ark. 1017, 188 S. W. 2d 629; *Murch-Jarvis Co.* v. *Townsend,* 209 Ark. 956, 193 S. W. 2d 310; and *Batesville White Lime Co.* v. *Bell,* 212 Ark. 23, 205 S. W. 2d 31.

In *Herron Lumber Co.* v. *Neal (supra),* the worker had a gastric ulcer which ruptured while he was performing a task that required extra energy. We held that the worker suffered an *accidental injury* within the purview of the Workmen's Compensation Law, and quoted from 71 C. J. 607:

" 'Injury from strain or over-exertion due to a physical condition predisposing the employee to injury is an injury within the terms of the various workmen's compensation acts. . . .' "

In *McGregor* v. *Arrington (supra),* the worker was a carpenter. He had an impaired heart, and, in trying to move a plank, he overexerted himself and suffered a collapse and died. We allowed compensation, saying that the decedent's death resulted from an accidental injury arising out of and in the course of his employment.

In *Harding Glass Co.* v. *Albertson (supra),* the worker also had an impaired heart; and while at work

___

[3] For other cases so holding, see West's Arkansas Digest, "Workmen's Compensation," Cumulative Pocket Part, § 1939.

suffered a heat prostration and died. In allowing compensation, we quoted from Schneider on Workmen's Compensation Text, Vol. 4, § 1328, p. 543:

" 'It may be stated generally that if the conditions of the employment, whether due to over-exertion, excessive heat, excessive inhalation of dust and fumes, shock, excitement, nervous strain or trauma, tend to increase an employee's blood pressure sufficiently to cause a cerebral hemorrhage, such result constitutes a compensable accident within the intent of most compensation acts, though the employee may have been suffering from a pre-existing diseased condition which predisposed him to such result, or where such result would have occurred in time due to the natural progress of such pre-existing condition. . . . The majority of the American courts follow the English rule as set out in the case of *Clover, Clayton & Co.* v. *Hughes* (1910), A. C. 242: "An accident arises out of the employment when the required exertion producing the accident is too great for the man undertaking the work, whatever the degree of exertion or condition of health." ' "

In *Sturgis Brothers* v. *Mays (supra),* the worker, in the course of his employment, overtaxed his previously weakened heart and died. In allowing compensation, we quoted a leading case:

" 'Nor is it a defense that the workman had some predisposing physical weakness but for which he would not have broken down. If the employment was the cause of the collapse, in the sense that but for the work he was doing it would not have occurred when it did, the injury arises out of the employment.' "

In *Murch-Jarvis Co.* v. *Townsend (supra),* the worker became disabled from inhaling fumes and dust in the course of his work in a smelter room. We held such disability to be "an accidental injury within the meaning of our Workmen's Compensation Law," saying:

"There are numerous cases from other jurisdictions holding that a disease, or an aggravation thereof, resulting from inhalation of dust particles or fumes may con-

stitute an accident, or injury, within the meaning of the particular act involved."

In *Batesville White Lime Co.* v. *Bell (supra),* the inhalation of dust particles caused heart trouble. We held such to be an accidental injury, saying:

"Now there is nothing in the proof in this case to justify a conclusion that the injury to appellee's heart by breathing the excessive amount of dust was one which appellee might have reasonably expected or anticipated. Certainly it was accidental as far as he was concerned; and there is much authority for a holding that an injury, not necessarily the result of one impact alone, but caused by a continuation of irritation upon some part of the body by foreign substances may properly be said to be accidental."

With the cases above mentioned having established a rule of decision, we apply such to the facts in the case at bar, which facts we now examine:

(a) It is undisputed that in 1944 the claimant was advised by his doctor that he was suffering from bronchitis, bronchiectasis, bronchial asthma, or some such respiratory ailment, which, regardless of name, made it difficult for the claimant to breathe; and it is also undisputed that this impaired breathing continued to trouble him at all times until his collapse. So we have a pre-existing ailment of some kind shown by undisputed evidence.

(b) Furthermore, it is undisputed that there was an increased work load on the night in question with increased smoke and fumes. We quote from appellant's testimony which is entirely undisputed on this point:

"Q. When you reported to work that evening were there orders for a heavier output that night?

"A. Yes sir.

"Q. Explain the orders.

"A. There were orders from the man I relieved that they wanted more metal.

.    .    .    .    .    .

"Q. In other words, they wanted a heavier [4] output that night?

. . . . .

"A. Yes sir.

. . . . .

"Q. You had to put more gas into the furnaces to get more metal?

"A. Yes sir.

"Q. By doing that, what did it do with reference to creating more smoke and fumes?

"A. It materially created more smoke and fumes.

. . . . . .

"Q. Was there any heavy concentration of smoke or fumes and oxide in this Block No. 1?

"A. It was pretty heavy that night.

"Q. Was it noticeably so?

"A. Yes sir."

There were also introduced the United States Weather Bureau reports from the station in Fort Smith, located about three-quarters of a mile from the appellee's plant, and without any natural or artificial barriers between the two places. The temperature readings were from a high of 18 degrees Fahrenheit at 10:00 p. m. the night

[4] At the second hearing held on December 15, 1949, another worker testified as to the work load on the night in question:

"Q. Well, did they start a new process?—Out there at that plant?·

"A. Well, along about that time, to the best of my knowledge, they did.

"Q. What time was that?

"A. Along in the latter part of January.

"Q. Of what year?

"A. Of 1949.

"Q. All right, now. We've got that date fixed, and you say the best of your recollection is that they did start a new process?

"A. Yes, sir.

"Q. Do you know what this process consisted of?

"A. Well, it increased the work load.

"Q. And just state whether or not it did cause more dust and smoke in there, or not.

"A. It did."

of January 28th, to a low of 14 degrees Fahrenheit at 6:00 a. m. the morning of January 29th.

(c) Finally, it is also undisputed that the appellant collapsed in the course of his work on the night in question and under the circumstances and conditions previously mentioned. He testified:

"Q. When did you first notice the severity of your condition that night?

"A. It was along close to midnight.

"Q. Was there any particular activity going on at that time?

"A. Yes sir, the metal drawers.

"Q. In other words, you say when the metal drawing is going on, it discharges more smoke, and about that time is when you first noticed the severity of your condition that night?

"A. Yes sir.

"Q. Now, go ahead and state whether or not that condition got better or worse.

"A. It just kept getting a little worse, and along about 2:00 o'clock, I was practically done.

"Q. What do you mean by 'practically done'?

"A. I got to where I couldn't hardly go any more.

.   .   .   .   .   .

"A. Well, some time during the night I was choking so bad, I passed out—how long, I don't know—and then come back."

Therefore, to summarize: we have in the case at bar undisputed facts which are similar in essential respects to those which existed in the six cases hereinbefore discussed, in each of which compensation was awarded. These facts are: a pre-existing ailment, an increased and overtaxing effort to accomplish the work load under the conditions existing, and a collapsed worker resulting therefrom. These make a case of *accidental*

*injury* within the purview of the Workmen's Compensation Law.

We hold that the Commission erred in failing to make an award because of the accidental injury suffered by claimant. Therefore the judgment of the Circuit Court is reversed and the cause is remanded, with directions that the Circuit Court remand the claim to the Workmen's Compensation Commission, with directions to make an award for the claimant in accordance with this opinion.

Mr. Justice HOLT not participating.

GEORGE ROSE SMITH, J., dissenting. If it were our duty to view the evidence in the light most favorable to the claimant I should agree with the majority opinion. But we are required to sustain the Commission's findings if supported by substantial evidence, and I do not see how it can be said that this record lacks such evidence.

The notion that the Commission tested the case on the basis of an occupational disease alone is untenable. The Act contains an exclusive list of occupational diseases; no other disease may be so classified unless the Commission amends the list. Ark. Stats. 1947, §§ 81-1314 and 81-1343 (11). The appellant's principal malady is nephritis, a serious kidney disease. He also suffers from bronchitis or bronchial asthma. Since none of these diseases is classified as an occupational disease it seems to me to be beside the point to suppose that the Commission denied the claim solely because no occupational disease existed. That was not even an issue in the case.

On the issue of accidental injury there is much evidence that is ignored by the majority. On this point the Commission stated in its opinion: "There is no evidence of any accidental injury or other unusual happenings or events during the claimant's last working day or in fact any other working days during his entire employment." The so-called "collapse" referred to by the majority appears to have occurred after Triebsch went home. Triebsch testified that he worked the entire shift on the night in question.

The culmination of appellant's illness on January 28 was by no means sudden or unexpected. He himself testified that for eighteen months his work had been too difficult for him. He often had to go outside and rest, while a fellow employee took his place. Other employees testified to the same effect, readily admitting that over this long period of time they had to help Triebsch with his work. As was inevitable, the appellant's kidney disease finally reached the point of totally disabling him.

It is not unusual for men to become disabled as a result of old age or disease; it happens to almost every one. But such a case is not compensable unless the employee's condition is aggravated by some accident occurring in the course of his employment. There is convincing medical testimony to the effect that nothing in the conditions at the smelter had any aggravating effect upon the claimant's maladies. Triebsch was a sick man and no doubt should not have worked at all during the last eighteen months. But there is substantial evidence to show that any labor at all would have brought on his disability. This being true, the disability is not compensable merely because the inevitable at last occurred, without the intervention of an accident. At least there was positive evidence to that effect, and I do not feel authorized to substitute my judgment for that of the Commission.

GRIFFIN SMITH, C.J., joins in this dissent.